*MHW*

RECEIVED
6-6-2008
JUN 0 6 2008 TC
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| - MINERVA HERNANDEZ )<br>, Plaintiff )<br>)<br>v. )<br>)<br>BOARD OF EDUCATION COMMUNITY )<br>SCHOOL DISTRICT NO. 60, Lake County )<br>Illinois, KAREN CARLSON, FERNANDO )<br>SHIPLEY, JEFF McBRIDE, MARVIN )<br>REDDICK, ANITA HANNA )<br>)<br>Defendants. ) | CIVIL ACTION<br><br>**08CV3290<br>JUDGE HART<br>MAGISTRATE JUDGE COLE** |

## COMPLAINT OF EMPLOYMENT DISCRIMINATION, COMPLAINT UNDER THE CIVIL RIGHTS ACT, TITLE 42 SECTIONS 1981, 1983, AND 1985(3), AND COMPLAINT UNDER THE COMMON LAW FOR BREACH OF CONTRACT AND RETALIATORY DISCHARGE

1.  This is an action for employment discrimination, civil rights violations under 42 U.S.C. §§

1981, 1983, and 1985(3), breach of contract, and retaliatory discharge.

2.  The plaintiff, a *pro se* litigant, is Minerva Hernandez ("Hernandez") of the county of Bexar in

the state of Texas.

3.  The defendant's are:

   a.  The Board of Education for Community School Schools District # 60 ("the District") of

   Waukegan IL, as former employer of the Hernandez, whose street address is 1201 N.

   Sheridan Rd., Waukegan, IL 60085.

   b.  Fernando Shipley ("Shipley"), former school board member of the District, whose street

   address is 512 Frolic Ave., Waukegan, IL 60085.

c.  Karen G. Carlson ("Carlson"), former associate superintendent of the District, whose

street address is 2122 Miraflores Ave., Waukegan, IL 60087.

d.  Jeffrey McBride ("McBride"), former school board member of the District, whose street

address is 2515 N Chestnut St, Waukegan, IL 60087.

e.  Marvin Reddick ("Reddick"), former school board member of the District, whose street

address is 910 S. Martin Luther King, #1 Waukegan, IL 60085.

f.  Anita Hanna ("Hanna"), former school board member of the District, whose street address

is 116 Spruce Ave., Waukegan, IL 60087.

4.  Hernandez was employed by Waukegan Public Schools, at 1201 N. Sheridan Rd., Waukegan,

County of Lake, IL 60085, and assigned to work at various locations.

5.  Hernandez was employed but is no longer employed by the defendant and was denied further
employment.

6.  The defendant discriminated against the plaintiff beginning on or about, March 2005 to
7/25/06.

7.    The defendant is not a federal governmental agency, and the plaintiff has filed a charge or
charges against the defendant asserting the acts of discrimination indicated in this complaint
with the United States Equal Employment Opportunity Commission, on or about 7/14/06 +
5/9/07.  A copies of the charge are attached.

It is the policy of both the Equal Employment Opportunity Commission and the Illinois
Department of Human Rights to cross-file with the other agency all charges received.
The plaintiff has no reason   to believe that this policy was not followed in this case.

8.    The United States Equal Employment Opportunity Commission has issued a *Notice of
Right to Sue*, which was received by the plaintiff on 3/11/2008.

9.    The defendant discriminated against the plaintiff because of the plaintiff's color and race
in violation of Title VII of the Civil Rights Act of 1964 and 42 U.S.C. §1981.

10.    If the defendant is a state, county, municipal (city, town or village) or other local
governmental agency, plaintiff further alleges discrimination on the basis of race, color,
or national origin (42 U.S.C. § 1983).

11.    Jurisdiction over the statutory violation alleged is conferred as follows: for Title VII

claims by 28 U.S.C.§1331, 28 U.S.C.§1343(a)(3), and 42 U.S.C.§2000e-5(f)(3); for
42 U.S.C.§1981 and §1983 and §1985(3) by 42 U.S.C.§1988. For common law and
state claims by 28 U.S.C. §1332.

12.   The plaintiff claims that:

a.   The defendant's regularly made decisions in their official capacities on the basis of
race and ethnic background. The decisions to suspend and terminate Hernandez, the
decision to breach Hernandez's contract, the promotion and allowance of a hostile work
environment, and other such decisions with respect to Hernandez were motivated, at least
in part by race and ethnic background. The defendants associated Hernandez as a leader
or symbol of Hispanics in the district and as such singled her out. Not only was she
Hispanic, and therefore perceived to have interests in tension with African-Americans in
the district, but as a symbol of other Hispanics, she was perceived to represent Hispanics
in conflict with African-Americans within the district. The defendants retaliated against
Hernandez for her reports of illegal or improper activity within the district and for her
failure to participate in their race-motivated agenda. The defendants further retaliated
against Hernandez and punished her for complaints of illegal behavior made by Hispanic
parents, as a perceived leader of Hispanics.

b.   The defendants breached their employment contract with Hernandez unilaterally, at
least in part, because of Hernandez's race and in part because of Hernandez's perceived
role as a Hispanic leader in the community. By breaching Hernandez's contract,
defendants caused Hernandez economic losses in pay, loss of status in her lower position,
and humiliation and distress.

c.   Defendants terminated Hernandez's employment under the pretext of insubordination,
which has subsequently affected her ability to find other employment. Her suspension
and termination were done in such a way as to make it generally known, even amongst
non-district community members, that Hernandez was terminated under negative
conditions.

d.   Defendants, along with other community members including Robert Evans Jr.,
conspired to deprive Hernandez of her rights to employment, to contract and to her due

3

process rights to a fair hearing because of race, in violation of her rights under 28 U.S.C.
§ 1981 and 1985(3).   The general philosophy and belief that was articulated by
community members and school board members who they were associated with that
Hispanics were a threat to African American's within the district created cooperation
between Shipley, Hanna, Reddick and McBride to take various measures including those
taken against Hernandez.   Carlson, as an administrator subject to annual renewal and
potentially seeking the position of superintendent which was going to become available,
chose to cooperate and promote the racially motivated agenda, to the detriment of
Hernandez.

e.  The defendant's actions were motivated by race and were discriminatory.   The school
board directly, at times, acted in a discriminatory way via its school board members, and
at times ratified acts and decisions of the administrators, such as Carlson.   The board
acted with final decision making authority in all of its actions.

13.   The facts supporting the plaintiff's claims are as follows:

a.  Hernandez was employed under a contract as a Parent Facilitator from 2/20/2002 until
7/25/2006.   Prior to June 2005, Hernandez was housed at the Parent Information and
Support Center ("PISC").   As a parent facilitator, Hernandez developed programs for
parents in the English Language Learner's Program, facilitated parent meetings,
developed and supported two Parent Advisory Committees, taught Active Parenting and
Parent's as Teachers seminars, represented the Parent Information and Support Center at
community meetings and events, organized a parent leadership program, as well as a
variety of other duties.

b.  Additionally, Hernandez had been the administrator for the Waukegan National
Hispanic Institute Youth Debate Team.   She was a member of Holy Family Parish, a
prominent and predominantly Hispanic Catholic parish in Waukegan.   She regularly
volunteered at Cooke Magnet Elementary School as the Mexican Booth coordinator for
the annual cultural festival.   She was a member of the Coalicion Latinos Unidos de Lake
County, a professional Hispanic organization.

c.  At a Special Education Board Committee Meeting on September 23, 2004, McBride

4

announced that he felt African American parents were not being served as well as Hispanic parents at the PISC. He announced that he wanted an African-American Parent Center to be developed, with staff that was in touch with the African-American community. He noted that none of the PISC's current staff was African-American. He expressed his understanding that the PISC served Hispanic parents. Staff present at the meeting explained that PISC programs were funded by and geared towards English Language Learners, which did not include all Hispanics or exclude non-Hispanics. McBride reiterated his desire for an African-American Parent Center to serve African-Americans.

d. In the fall of 2004, Carlson directed the PISC to seek funding to develop a leadership program for parents of the bilingual program. The program was developed by Hernandez, who arranged for trainings by a leadership trainer, Astrid Suarez, selected by Carlson. As part of the program, parents regularly attended school board meetings, sought meetings with administrators, and expressed their concerns to administrators. After these parents sought translation at school board meetings, publicly addressed inappropriate suspensions and expulsions of Hispanic bilingual students, and expressed to the Deputy Superintendent and Associate Superintendents specific grievances with their departments, Hernandez was approached by Carlson and told to direct the parents to stop. When Hernandez told Carlson that the parents were acting independently of her, other than the trainings which Carlson had implemented, and that she did not even know many of the parents, Carlson told Hernandez that she could control them and that she should. She directed Hernandez to have the parents focus their attacks on the Deputy Superintendent, which was African American, and not on her.

e. In March 2005, a parent mentor position was posted for the PISC. The PISC supervisor was instructed by Carlson to hire an African-American candidate or be fired. Hernandez was part of the interviewing committee for the position and was made aware of Carlson's directive.

f. At a school board meeting on March 22, 2005, comments were made by school board members and the Deputy Superintendent accusing Hernandez of organizing Hispanic

5

parents against African-American administrators.  Reddick instructed Hernandez, at one point during the meeting, to get her people out of the meeting.  He said they were her people and would follow her.

g.  Hernandez was asked by Carlson to attend a PISC steering committee meeting on March 24, 2005, at which Carlson invited Rev. Robert Evans ("Evans"), a non-member of the steering committee, to attend.  Evans regularly attended and continues to attend school board meetings as a community advocate who regularly addresses issues of race within the district.  At the steering committee meeting, he verbally attacked Hernandez for over an hour, making claims that she was only serving Hispanics and had to be stopped.  He made many racial comments.  Carlson, the only district-level administrator at the meeting and highest-level PISC administrator present, made no comments or attempts to curb the harassment.

h.  In a face-to-face meeting with Carlson, Carlson told Hernandez that she had invited Evans to the meeting and had Hernandez attend the meeting so that he could "blow off some steam".

i.  Prior to July 1, 2005, Carlson would regularly call Hernandez late at night to her personal cell phone, and set up meetings with Hernandez or with Hernandez and the parents, often after 9:00pm at local diners.  During these meetings Carlson would inform Hernandez and some parents that certain administrators and school board members were trying to shut down the parent program.

j.  On July 1, 2005, the locks were changed at the PISC without prior notice to the staff during the lunch hour.

k.  On July 6, 2005, Hernandez received a letter terminating her employment effective August 8th, 2005.  Prior to receiving the letter of termination, her first notice of any kind that she was even being considered for termination, the Mayor's liaison, a non-district employee, told Hernandez she was sorry to here about her job but was sure Hernandez would find another one soon.

l.  After a meeting with the director of Human Resources to clarify that her position was housed at the PISC but was independent from the PISC, Hernandez received a letter from

6

the superintendent on July 15th, 2005 directing her to disregard the letter of termination.

m.  Hernandez was only allowed to remove her personal belongings from the PISC on July 18th under supervision after nearly three weeks of being unable to access her property.

n.  On August 16th, the first day of the 2005-2006 school year, Hernandez began work pursuant to her signed contract as a parent facilitator.   The Director of her department gave her daily assignments to do primarily clerical and secretarial work at various schools.

o.  On September 8th, 2005, Hernandez was given a letter by Carlson from Human Resources, dated August 25th, stating that her current employment contract was being revoked and she was being reassigned as a bilingual teacher aide.

p.  Hernandez attempted to set up meetings with her Director and with Carlson who cancelled on her and failed to show up to several meetings.

q.  At a meeting with Carlson, Hernandez was given three job options, each a lower position than Parent Facilitator under her original contract, each at lower pay than her original contract, and each involving less duties, responsibilities, and skill than the Parent Facilitator position.

r.  On September 9th, 2005, Human Resources informed Hernandez that Dr. Carlson had decided that Hernandez's new salary would be lower than under her original contract. Hernandez delivered two letters to Human Resources informing them that she accepted a position under duress and did not consent to the revocation or waive her rights under the original contract.   On September 19th, she received a new contract for less pay and listed her as Miscellaneous Personnel.   After months of being assigned menial duties, at the reduced salary, and without being assigned to a location or an office, while on medical leave, Hernandez received a "Recommendation of Termination" letter dated December 6th, 2005 which set a hearing date for January 10th, 2006.   Hernandez returned to work from her medical leave on January 9th and was sent home with pay pending the outcome of the hearing.

s.  The hearing was stayed and on January 19th, Hernandez was sent a letter saying she

7

was suspended with pay until further notice.    After several postponements, a hearing was held on February 14th for charges of insubordination, after which Hernandez was terminated.    The State Unemployment Board found that the insubordination allegations were not established by the District.

t.    During the months preceding the termination, Hernandez was singled out and was constantly being checked-up on by high level administration, particularly Carlson.    Other employees in similar positions were only supervised by their immediate supervisors.

u.    Throughout the 2004-2005 school year, various racial comments were made by school board members and by Evans at school board meetings.

    i.    In the fall of 2002, prior to his election to the board, Shipley and Evans made racial slurs at a school board meeting regarding the primarily Caucasian make-up of the school board.

    ii.    Shipley stated, "We have to get rid of that brown bitch." outside of a school board meeting with reference to Hernandez.

    iii.    In a closed administrator's meeting, Shipley's racial slur towards Hernandez was addressed as a problem that had to be dealt with.

    iv.    McBride stated in an open board meeting, after an election of a majority of African American school board members, that now there was a majority of "Black" school board members and "our time has come."

    v.    Shipley told the PISC supervisor that the PISC had to be closed for not servicing African Americans.

    vi.    Evans made statements at various school board meetings regarding the racial imbalances in staff demographics, the need for the district staff to proportionately reflect the racial composition of the district, the need to fire a particular white administrator, and that "it ain't no fun when the rabbit got the gun" referring to the now African-American majority on the board.

    vii.    McBride, Reddick, and Shipley regularly left open school board meetings while they were in session to conference with each other or with Evans in the hallway.

8

viii.   McBride, Reddick, Shipley, and Hanna regularly voted on racial lines.

ix.   Reddick presented a document to the board and public in an open school board meeting and stated that there was an investigation launched by a white PISC administrator against an African American principal and that it was racist.

x.   Evans and Shipley were involved with the Waukegan, North Chicago, Zion Coalition for Better Government.   Evans regularly stated that his agenda, on behalf of the Coalition, was to get "African Americans" into positions of power, particularly in the District.

xi.   Hanna made statements in an open school board meeting that she did not believe the district should have to educate undocumented Hispanic students, even though she understood from the lawyers that the Constitution required it.

15.      The plaintiff demands that the case be tried by a jury.  ☒ YES      NO

16.      THEREFORE, the plaintiff asks that the court grant the following relief to the plaintiff:

a.   Plaintiff asks the court to direct defendant's to retroactively reinstate plaintiff to her original position as Parent Facilitator under her original contract for the school year 2004-2005 and to remove the termination documentation from her employee file.

b.   If available, grant the plaintiff appropriate injunctive relief, lost wages, liquidated/double damages, front pay, compensatory damages, punitive damages, prejudgment interest, post-judgment interest, and costs, including reasonable attorney fees and expert witness fees.

c.   Grant such other relief as the Court may find appropriate.

(Plaintiff's signature)

_Minerva Hernandez_

Minerva Hernandez   8518 Ridge Stone St. San Antonio, TX 78251   (210) 481-8394

Date: _6/6/08_

9